# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OMRON CORPORATION, a Japanese corporation,<br>1 Commerce Drive<br>Schaumburg, IL 60173<br><br>Plaintiff,<br><br>vs.<br><br>VERVE, LLC, a Texas corporation,<br>6300 Bridgepoint Parkway<br>Building I, Suite 410-B<br>Austin, TX 78730<br><br>Registered Agent:<br>Raymond Galasso<br>8127 Mesa Drive #B-206-67<br>Austin, TX 78759<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Omron Corporation ("Omron"), by its undersigned attorneys, for its Complaint for Declaratory Judgment against Defendant Verve L.L.C. ("Verve"), alleges and states as follows:

### PARTIES AND NOTABLE INDIVIDUALS

1.    Omron Corporation ("Omron") is a company organized under the laws of the country of Japan and has its principal place of business at Karasuma Nanajo Shimogyo-ku, Kyoto, 600-8530 Japan. Omron Corporation does business in the United States through various subsidiary companies, and the North American headquarters for its U.S. holding companies is at 1 E. Commerce Drive, Schaumburg, IL 60173.

2.    Omron Corporation is a global leader in the field of automation. Omron provides products and services to customers in a variety of fields including industrial automation, electronic components, social systems and healthcare.

3.    Verve, LLC ("Verve") is a limited liability company organized under the laws of the State of Texas.  Its principal place of business is in Austin, Texas.

4.    Verve describes itself as an Intellectual Services Provider that evaluates existing patent portfolios to realize a maximum economic potential.

5.    Raymond Galasso ("Galasso") is a 50% owner of Verve L.L.C.

6.    Kevin Imes ("Imes") is a 50% owner of Verve L.L.C.

7.    Herbert Kerner was Omron's attorney and representative, at all pertinent times hereto.  *See* Affidavit of Herbert Kerner ("Kerner Aff.") ¶ 6, attached hereto as Exhibit A.

## JURISDICTION, VENUE, AND APPLICABLE RULES

8.    This Complaint for Declaratory Judgment is one over which this Court has original jurisdiction under 28 U.S.C. § 1332(a), in that it is a civil action between a citizen of a foreign state and a citizen of the state of Texas, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claim occurred in this judicial district.

10.    Because this Complaint seeks a declaratory judgment, it is governed by 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.  Fed. R. Civ. P. 57 provides that "[t]he court may order a speedy hearing of an action for a declaratory judgment and may advance it on the calendar."

## COUNT I – ACTION FOR DECLARATORY JUDGMENT

### ASSIGNMENT AGREEMENT HISTORY

11.    Beginning in 2003, Omron and Verve entered into a series of agreements under which Omron assigned or licensed rights to several of its patents to Verve.

12.    In August 2003, Omron entered into assignment agreement no. 81303 with Verve, under which Omron assigned to Verve two United States patents, United States Patent Numbers 4,630,200 and 4,678,895.

13.    In October 2003, Omron entered into assignment agreement no. 101403 with Verve, under which Omron assigned to Verve two more patents, United States Patent Numbers 4,562,340 and 4,562,341.

14.    On March 19, 2004, Omron entered into assignment agreement no. 31804 ("the Agreement") with Verve, attached hereto as Exhibit B.  In the Agreement, Omron assigned 11 additional United States patents to Verve, and licensed 9 additional patents.  One of the 11 patents that Omron assigned to Verve under the Agreement was United States patent 5,012,077.

15.    The Agreement altered and superseded the terms under which the previously assigned patents had been assigned.  *See* Agreement at Introduction ("Omron and Verve desire to alter and supersede the terms under which Omron's four (4) previously assigned patents were assigned under Assignment Agreements Nos. 081303 and 101403.").  Accordingly, as of March 19, 2004, all patents assigned by Omron to Verve were governed by the Agreement.

### THE AGREEMENT

16.    In return for the rights to the patents Omron assigned to Verve under the Agreement, Verve agreed to pay to Omron certain percentages of the revenue Verve was able to generate from the sale, license, transfer, enforcement, settlement, covenant not to sue or any other disposition of those certain patents (less any Applied Deductions).  *See* Agreement at Section 4.1.

17.     Section 4.1 of the Agreement provided that Verve would pay 50% of the first $10 million of total aggregate Net Licensing Revenue to Omron. *See id.*

18.     Omron has received less than $500,000 from Verve under Section 4.1, so under the Agreement, Omron was entitled to receive 50% of all Net Licensing Revenue Verve received from any disposition of patents governed by the Agreement.

19.     Verve further agreed in the Agreement to make a full written report to Omron detailing the amounts Verve owed to Omron pursuant to the Agreement within 30 days of Verve's receipt of those payments.  Section 4.3 of the Agreement states: "VERVE agrees to make a full written report to OMRON detailing the fees due pursuant to Section 4.1 above within thirty-days (30) of any payments being received by VERVE.  Such written reports shall include a full and complete account of all payments reducing the amount of the NET LICENSING REVENUE.  Such an accounting shall include a detailed breakdown of all APPLIED DEDUCTIONS."

20.     Section 1.5 of the Agreement defines "COLLECTED LICENSING REVENUE" as "the gross total revenue, value or benefit received by or through VERVE from the sale, license, transfer, enforcement, settlement, covenant not to sue or any other disposition of any of the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS."   Accordingly, "Collected Licensing Revenue" includes the revenue received through settlements relating to the patents assigned under the Agreement.

21.     Section 1.6 of the Agreement defines "Net Licensing Revenue" as Collected Licensing Revenue minus Applied Deductions.

22.     Section 1.7 of the Agreement defines "Applied Deductions" as "reasonable third-party attorney fees, reasonable out-of-pocket costs, and reasonable third-party expert witness fees, which Verve incurs to obtain Collected Licensing Revenue.  Applied

Deductions shall not include any fees for the time spent by Verve personnel, its employees or principals."

23.    The Agreement clearly explains that intentional misreporting of Collected Licensing Revenue or misapplication of Applied Deductions or Collected Licensing Revenue shall be grounds for immediate termination or the Agreement, which causes all rights to the Assigned Patents, Licensed Patents and Previously Assigned Patents to revert back to Omron:

> 5.3    TERMINATION FOR CAUSE. INTENTIONAL OR ROUTINE MISREPORTING OR MISAPPLICATION OF APPLIED DEDUCTIONS OR COLLECTED LICENSING REVENUE SHALL BE GROUNDS FOR IMMEDIATE TERMINATION OF THIS AGREEMENT. WHEN SO TERMINATED, ALL RIGHTS GRANTED TO VERVE TO THE ASSIGNED PATENTS, LICENSED PATENTS AND PREVIOUSLY ASSIGNED PATENTS SHALL REVERT BACK TO OMRON.

24.    In April 2004, Omron and Verve entered into addendum 1-033004. This addendum did not alter Verve's obligations with respect to the reporting of Applied Deductions or Collected Licensing Revenue under the Agreement. A copy of the Addendum is attached hereto as Exhibit C.

## VERVE SETTLEMENTS WITH RADIANT AND CYBERNET

25.    Herbert Kerner, Omron's attorney and representative, was Omron's only contact with Verve with respect to the Agreement. *See* Kerner Aff. at ¶ 6. Mr. Kerner currently works in the Washington, D.C. office of Baker and Daniels. *See id.* at ¶ 2. At all times pertinent to this matter, Mr. Kerner has been Omron's attorney and representative and has worked out of law offices in Washington, D.C.

26.    When Verve negotiated the Agreement with Omron, via phone, email, and face to face contacts, it conducted these communications with Mr. Kerner, primarily while Mr. Kerner was in Washington, D.C.

27.     When Verve reported Collected Licensing Revenue to Omron, it did so by contacting Mr. Kerner in Washington, D.C.    Pursuant to Section 4.3 of the Agreement, Verve reported five settlements to Omron between 2004 and 2006.    Each time, Verve reported the settlements by informing Mr. Kerner. *Id.* at ¶ 6.

28.     Omron assigned U.S. patent No. 5,012,077 to Verve under the Agreement.

29.     Verve threatened and/or filed lawsuits against entities it identified, including filing and prosecuting lawsuits at the International Trade Commission, 500 E. Street, SW, Washington, D.C. 20436.

30.     On July 31, 2004, Verve brought suit against Cybernet, Inc. ("Cybernet") in the International Trade Commission, alleging that Cybernet had infringed the U.S. patent No. 5,012,077.

31.     On August 30, 2004, Verve brought suit against Cybernet in the Northern District of California, civil action C04-03659 JF, also alleging that Cybernet had infringed the U.S. patent No. 5,012,077.

32.     On October 24, 2006, at the trial of a case captioned <u>Hypercom Corporation v. Verve, LLC, et al.</u>, No. 05-365 ("Hypercom Trial"), filed in the United States District Court for the District of Arizona, Kevin Imes, 50% owner of Verve, testified that Cybernet paid Verve $25,000 to settle its litigation with Verve ("Cybernet settlement"). *See* 10/24/06 Hypercom Trial Transcript, Testimony of Kevin Imes, at 725:10-11, attached hereto as Exhibit D.

33.     On information and belief, Cybernet paid this $25,000 to Verve in late 2004.

34.     Although Verve was obligated to report the Cybernet settlement to Omron within 30 days in accordance with Section 4.3 of the Agreement, Verve never reported this settlement to Mr. Kerner nor anyone else at Omron. *See* Kerner Aff. ¶ 10.

35.    Although Verve was obligated to pay Omron a percentage of the $25,000 settlement under Section 4.1 of the Agreement, Verve did not make any such payment to Omron.

36.    Omron first assigned U.S. patent No. 4,562,341 to Verve under assignment agreement no. 101403. Omron subsequently assigned U.S. patent No. 4,562,341 to Verve under the Agreement.

37.    On February 4, 2004, Verve brought suit against Radiant Systems, Inc. ("Radiant") in the Western District of Texas, in Civil Action No. 1:04-cv-00062-LY, alleging that Radiant had infringed United States patent 4,562,341.

38.    On October 24, 2006, at the Hypercom Trial, Kevin Imes testified that Verve entered into a settlement with Radiant pursuant to which Radiant paid Verve $100,000 ("Radiant settlement"). *See* 10/24/06 Hypercom Trial Transcript, Testimony of Kevin Imes, at 725:7-9.

39.    On information and belief, Radiant paid this $100,000 to Verve in early 2005.

40.    Although Verve was obligated to report this Collected Licensing Revenue to Omron within 30 days in accordance with Section 4.3 of the Agreement, Verve never reported the Radiant settlement to Omron. *See* Kerner Aff. ¶ 10. Herbert Kerner repeatedly asked Verve for information related to the settlement, but Verve repeatedly refused to provide any such information. *See id.* ¶ 7.

41.    Although Verve was obligated to pay Omron a percentage of the $100,000 settlement under Section 4.1 of the Agreement, Verve did not make any such payment to Omron.

42.    Verve's intentional failure to report the Radiant settlement and the Cybernet settlement to Omron constitutes a violation of Verve's contractual obligation to report Net Licensing Revenue and Applied Deductions to Omron within 30 days of the receipt of such payments.

43.    Verve's intentional failure to report the Radiant settlement and the Cybernet settlement to Omron constitutes a violation of Verve's contractual obligation to pay Omron a percentage of the Collected Licensing Revenue it collects under the Agreement.

44.    Pursuant to Section 5.3 of the Agreement described above, the Agreement should terminate immediately, and all rights Omron granted to Verve to the patents described in the Agreement should revert back to Omron.

45.    There is a genuine between Omron and Verve regarding who controls the intellectual property in the Assigned Patents, Licensed Patents and Previously Assigned Patents. A declaratory judgment would resolve this controversy and provide necessary clarity as to whether Omron now controls those intellectual property rights.

WHEREFORE, Plaintiff Omron Corporation respectfully prays, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* and Fed. R. Civ. P. 57, that this Honorable Court enter a declaratory judgment in Omron's favor declaring:

a)    Omron is entitled to a full written report detailing the fees due to Omron owed from the payments received by Verve pursuant to the Agreement, including but not limited to the Cybernet and Radiant settlements;

b)    Omron is entitled to payment of 50% of the Net Licensing Revenue, as defined in the Agreement, resulting from any payments received by Verve pursuant to the Agreement, including but not limited to the Cybernet and Radiant settlements;

c)    Omron is entitled to terminate the Agreement, effective immediately, due to Verve's intentional or routine misreporting or misapplication of applied deductions or collected licensing revenue, including but not necessarily limited to, Verve's failure and refusal to report on payments received by Verve pursuant to the Agreement and its failure and refusal to pay Omron 50% of the Net Licensing Revenue, as defined in the Agreement;

d)　　The Assigned Patents, Licensed Patents and Previously Assigned Patents revert back to Omron; and

e)　　Such further relief as this Court deems just and proper.

August 27, 2007　　　　　　　　　　　　Respectfully submitted,

Charles B. Klein (D.C. Bar No. 450984)
Gina M. Del Negro (D.C. Bar No. 468920)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000
(202) 282-5100 – facsimile

Matthew A.C. Zapf (*pro hac vice* to be filed)
A. Colin Wexler (*pro hac vice* to be filed)
GOLDBERG KOHN
55 East Monroe, Suite 3300
Chicago, IL 60603
(312) 201-4000
(312) 863-7467 - facsimile

Counsel for Omron Corporation

DC:528087.1

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Omron Corporation | Verve, LLC |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    99999<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF<br>LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Charles B. Klein<br>Winston & Strawn LLP<br>1700 K Street, NW<br>Washington, DC 20006 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
    Plaintiff

○ 2 U.S. Government
    Defendant

○ 3 Federal Question
    (U.S. Government Not a Party)

⊙ 4 Diversity
    (Indicate Citizenship of
    Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ⊙ 5 |
| Citizen or Subject of a<br>Foreign Country | ⊙ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/**
   ***Malpractice***

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency**
   ***Review***

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
       Administrative Agency is Involved)

○ **D. Temporary Restraining**
   ***Order/Preliminary***
   ***Injunction***

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**         OR         ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
       defendant
☐ 871 IRS-Third Party 26
       USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
       of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
       Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
       Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
       Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
       Exchange
☐ 875 Customer Challenge 12 USC
       3410
☐ 900 Appeal of fee determination
       under equal access to Justice
☐ 950 Constitutionality of State
       Statutes
☐ 890 Other Statutory Actions (if
       not administrative agency
       review or Privacy Act

| ○ **G.** *Habeas Corpus/* *2255* | ○ **H.** *Employment* *Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA* *(non-employment)* | ○ **L.** *Other Civil Rights* *(non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

declaratory judgment pursuant to 28 U.S.C. § 2201

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** declaratory judgment | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** YES ☐ NO ☒ | |

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 8/27/07   SIGNATURE OF ATTORNEY OF RECORD *[signature]*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT A

# AFFIDAVIT OF HERBERT V. KERNER

I, Herbert V. Kerner, hereby state as follows:

1.    I am over the age of 21, have personal knowledge of the matters set forth herein and, if called as a witness in this matter, could and would testify competently thereto.

2.    I am currently an attorney and partner at the law firm of Baker & Daniels LLP ("Baker"). I work in Baker's Washington, D.C. office.

3.    I represented Omron Corporation ("Omron") with respect to that certain "Patent Assignment and License Agreement Between Omron Corporation and Verve, L.L.C." entered into as of March 19, 2004 by and between Omron and Verve, L.L.C. (the "Agreement"). An addendum to the Agreement was added by the parties on or about April 2, 2004. A true and correct copy of the Agreement and addendum is attached hereto as Exhibit A.

4.    Pursuant to the Agreement, Omron assigned and/or licensed certain of its rights to certain patents to Verve, L.L.C. ("Verve"). In return, Verve agreed to pay to Omron certain percentages of the revenue Verve was able to generate from the sale, license, transfer, enforcement, settlement, covenant not to sue or any other disposition of those certain patents. Verve further agreed to make a full written report to Omron detailing the amounts Verve owed to Omron pursuant to the Agreement.

5.    The Agreement includes the following provision:

> 5.3    TERMINATION FOR CAUSE. INTENTIONAL OR ROUTINE MISREPORTING OR MISAPPLICATION OF APPLIED DEDUCTIONS OR COLLECTED LICENSING REVENUE SHALL BE GROUNDS FOR IMMEDIATE TERMINATION OF THIS AGREEMENT. WHEN SO TERMINATED, ALL RIGHTS GRANTED TO VERVE TO

THE ASSIGNED PATENTS, LICENSED PATENTS AND PREVIOUSLY ASSIGNED PATENTS SHALL REVERT BACK TO OMRON.

6.    As Omron's attorney and representative, I was Omron's sole interface with Verve with respect to the Agreement. Pursuant to the Agreement, Verve informed me, as Omron's representative, of the following settlements that resulted in Verve owing payments to Omron:

| Settlement Date | Company | Omron Royalty Payment |
|---|---|---|
| January, 2004 | Schlumberger | $48,000.00 |
| September, 2004 | Mist | $31,200.00 |
| July, 2005 | VeriFone Inc. | $97,625.00 |
| May, 2006 | Lipman USA Inc. | $97,000.00 |
| May, 2006 | First Data Corp. | $8,000.00 |

7.    In addition to the settlement agreements described above, I had reason to believe that Verve entered into a settlement agreement with Radiant Systems, Inc. ("Radiant"). I repeatedly asked Verve for information related to that settlement. However, Verve refused to provide me with any information related to that settlement and never made any payment to Omron related to that settlement.

8.    I have since learned that Verve did, indeed, enter into a settlement agreement with Radiant and that Radiant paid $100,000 to Verve. At the trial of a case captioned Hypercom Corporation v. Verve, LLC, et al., No. 05-365, filed in the United Stated District Court for District of Arizona, one of the owners of Verve, indeed a 50% owner of Verve, Kevin Imes ("Imes"), testified that Radiant entered into a settlement

-2-

agreement with Verve and paid $100,000 to Verve. Verve's settlement agreement with Radiant was subject to the Agreement.

9.    Imes also testified that Verve entered into a settlement agreement with Cybernet pursuant to which Cybernet paid Verve $25,000.

10.    Verve's settlement agreement with Cybernet was also subject to the Agreement. Verve never disclosed to me or Omron that Verve had entered into a settlement agreements with Radiant or Cybernet.

11.    Verve's intentional failure to report its settlements with Radiant and Cybernet was a violation of its contractual obligation to Omron under the Agreement. Accordingly, pursuant to Section 5.3 of the Agreement described above, all rights Omron granted to Verve to the patents described in the Agreement revert back to Omron.

12.    Under penalty of perjury, the undersigned certifies that the statements set forth in this instrument are true and correct to the best of my knowledge, information and belief.

Dated: June 6, 2007

_____
Herbert V. Kerner

SWORN TO BEFORE ME this

6th day of June , 2007

NOTARY PUBLIC

My Commission Expires: 9-10-2008

_____

LINDA ROGERS
Notary Public-Maryland
Prince George's County
My Commission Expires
September 10, 2008

-3-

# EXHIBIT B

Agreement No. 031804

## PATENT ASSIGNMENT AND LICENSE AGREEMENT
## BETWEEN
## OMRON CORPORATION
## AND VERVE, L.L.C.

This AGREEMENT ("Agreement") is entered into as of March 19, 2004 by and between OMRON Corporation, a corporation organized under the laws of Japan ("OMRON"), and VERVE, L.L.C., a limited liability company organized under the laws of the State of Texas ("VERVE"). OMRON and VERVE are hereinafter referred to as the "Parties."

WHEREAS, OMRON owns the eleven (11) United States patents listed in Appendix A to this Agreement;

WHEREAS, OMRON desires to assign, and VERVE desires to acquire, all right, title, and interest in and to the patents listed in Appendix A;

WHEREAS, OMRON owns the nine (9) United States patents as listed in Appendix B to this Agreement;

WHEREAS, OMRON desires to exclusively license, and VERVE desired to obtain an exclusive license to the patents listed in Appendix B;

WHEREAS, OMRON has previously assigned four (4) United States patents (listed in Appendix C to this Agreement) to VERVE under Assignment Agreements Nos. 081303 and 101403 (attached as Appendix D and Appendix E to this Agreement); and

WHEREAS, OMRON and VERVE desire to alter and supersede the terms under which OMRON's four (4) PREVIOUSLY ASSIGNED PATENTS were assigned under Assignment Agreements Nos. 081303 and 101403.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration receipt of which each party hereby acknowledges, the parties hereby agree as follows:

1.    DEFINITIONS

1.1    "ASSIGNED PATENTS" shall mean the eleven (11) United States patents listed in Appendix A to this Agreement.

1.1.1    "LICENSED PATENTS" shall mean the nine (9) United States patents listed in Appendix B to this Agreement.

Page 1 of 9

Omron    Verve

Agreement No. 031804

1.1.2 "PREVIOUSLY ASSIGNED PATENTS" shall mean the four (4) United States patents listed in Appendix C to this Agreement.

1.2 "OMRON" means OMRON Corporation and its SUBSIDIARIES together with its corporate parent and the parent's SUBSIDIARIES.

1.3 "VERVE" means VERVE, L.L.C., a Texas Limited Liability Company and its SUBSIDIARIES.

1.4 "SUBSIDIARIES" of a company or a corporation means corporations or other legal entities (I) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (II) which do not have outstanding shares or securities but the majority of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly.

1.5 "COLLECTED LICENSING REVENUE" shall mean the gross total revenue, value or benefit received by or through VERVE from the sale, license, transfer, enforcement, settlement, covenant not to sue or any other disposition of any of the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS. COLLECTED LICENSING REVENUE shall be calculated in U.S. dollars, using established generally accepted accounting principles.

1.6 "NET LICENSING REVENUE" shall mean the COLLECTED LICENSING REVENUE minus APPLIED DEDUCTIONS. NET LICENSING REVENUE shall be calculated in U.S. dollars, using established generally accepted accounting principles.

1.7 "APPLIED DEDUCTIONS" shall mean reasonable third-party attorney fees, reasonable out-of-pocket costs, and reasonable third-party expert witness fees, which VERVE incurs to obtain COLLECTED LICENSING REVENUE. APPLIED DEDUCTIONS shall not include any fees for the time spent by VERVE personnel, its employees or principals. APPLIED DEDUCTIONS shall be calculated in U.S. dollars, using established generally accepted accounting principles.

1.7.1 Third-party attorney fees shall not exceed the following fee schedule:

(a) If COLLECTED LICENSING REVENUE is collected from a party without the filing of any suit against that party or prior to the commencement of fact discovery against that party, the third-party attorney fees shall be limited to the reasonable hourly fees incurred and shall be included with all APPLIED DEDUCTIONS not to exceed eight percent (8%) of the COLLECTED LICENSING REVENUE. Such fees may include fees for any pre-suit investigation, settlement communications and related agreement work, and preparing, filing and serving of any suit and any other legal work related to such suit(s) up to the commencement of fact discovery.

Page 2 of 9

Omron    Verve

**OMRON 00162**

Agreement No. 031804

(b) If COLLECTED LICENSING REVENUE is collected from a party against whom a suit is filed and against whom the suit proceeds beyond the commencement of fact discovery; third-party attorney fees shall be limited to fifteen percent (15%) of any COLLECTED LICENSING REVENUE.

(c) If COLLECTED LICENSING REVENUE is collected from a party against whom a suit is filed and against whom the suit proceeds beyond the close of fact discovery or beyond a claim construction order, third-party attorney fees shall be limited to twenty-one percent (21%) of any COLLECTED LICENSING REVENUE .

(d) If COLLECTED LICENSING REVENUE is collected from a party against whom a suit is filed and against whom the suit proceeds beyond a summary judgment order (wherein such summary judgment order occurs beyond the close of fact discovery or beyond a claim construction order) or beyond commencement of trial , third-party attorney fees shall be limited to twenty-eight percent (28%) of any COLLECTED LICENSING REVENUE .

1.7.2  Excluding third-party attorney fees incurred from a suit proceeding beyond the commencement of fact discovery (i.e. excluding fees under 1.7.1(b), (c) and (d)), the total APPLIED DEDUCTIONS subtracted from COLLECTED LICENSING REVENUE may not exceed eight percent (8%) of the COLLECTED LICENSING REVENUE.

1.7.3   Any third-party attorney fees or APPLIED DEDUCTIONS in excess of the provisions set forth above shall not be used to reduce the NET LICENSING REVENUE from which OMRON's payment is calculated pursuant to Section 4 below.

1.7.4  Calculating APPLIED DEDUCTIONS:  The flow chart entitled "Collected Revenue Flow Chart for Revenue Paid To Omron By Verve Under Agreement No. 031804" (attached as Appendix F to this Agreement) embodies the Parties understanding of the proper method of calculating and applying APPLIED DEDUCTIONS under Section 1.7 of this Agreement. This flow chart is hereby incorporated as a part this Agreement.

2.     GRANT OF RIGHTS TO VERVE.

2.1   ASSIGNED PATENTS.  Subject to the conditions set forth in this Agreement, OMRON agrees to assign all of OMRON's right, title and interest in the ASSIGNED PATENTS, including any and all accrued causes of action for damages for past, present and future infringement thereof.  In furtherance of this Agreement, OMRON hereby acknowledges that, from the Effective Date forward, VERVE has succeeded to all of OMRON's right, title, and standing to receive all rights and benefits pertaining to the ASSIGNED PATENTS, to institute and prosecute all suits and proceedings, and to take all actions that VERVE, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind under the ASSIGNED PATENTS, whether arising before or after the date of this Agreement.

Page 3 of 9

*T. N. / R. m. b.*

Omron      Verve

**OMRON 00163**

Agreement No. 031804

2.2  <u>LICENSED PATENTS</u>.  Subject to the conditions set forth in this Agreement, OMRON grants to VERVE a worldwide, exclusive license, including the right to sublicense, to make, have made, use, sell, offer to sell, import or lease the inventions claimed in the LICENSED PATENTS in return for the consideration set forth in Section 4 below.

2.3  OMRON shall maintain the exclusive right, but not the obligation, to enforce the LICENSED PATENTS in its own name against selected infringers. This right shall include the exclusive right to sue for infringement of the LICENSED PATENTS.

2.4  OMRON and VERVE hereby further agree and acknowledge that OMRON has previously assigned to VERVE all of OMRON's right, title and interest in the PREVIOUSLY ASSIGNED PATENTS including any and all accrued causes of action for past, present and future infringement and that this Agreement does not alter such previous assignment other than as set out in this Agreement.

2.5  In order to affect such ownership transfer, contemporaneously with the execution of this Agreement, OMRON has executed certain separate assignment documents, to be recorded with the United States Patent and Trademark Office. OMRON shall cooperate with VERVE as reasonably necessary to effectuate the recording of the separate assignment documents with the United States Patent and Trademark Office.    OMRON shall cooperate with VERVE as reasonably necessary in VERVE's efforts to secure COLLECTED LICENSING REVENUE without any additional consideration except as set forth in Section 4 below.

2.6  OMRON shall deliver to VERVE non-confidential documentation pertaining to the ASSIGNED PATENTS and LICENSED PATENTS, including copies of non-confidential correspondence to or from potential licensees of the technology claimed in the ASSIGNED PATENTS and LICENSED PATENTS.

3.    GRANT OF RIGHTS TO OMRON.

3.1  <u>License to OMRON</u>.  Upon execution of the assignment document, VERVE grants to OMRON a non-exclusive, worldwide, irrevocable, sub-licensable, perpetual, royalty-free, fully paid-up, license under the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS to reproduce, make, have made, use, import, offer for sale, and sell any products or services.    VERVE understands that OMRON's license to the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS extends to OMRON's present customers and clients for the products and services they receive from OMRON.

3.2  <u>Right to Sub-License and Cross-License</u>.  Under OMRON's license defined in Section 3.1 above, OMRON is granted the right to sub-license and cross-license the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS to OMRON's present and future business partners and customers.  This right is waived with respect to parties for which OMRON has already been provided the opportunity to determine whether certain

Page 4 of 9



Omron        Verve

**OMRON 00164**

potential licensees or parties were a present customer or client of OMRON and that VERVE has already filed suit against subject to Section 3.4.

3.3 <u>Right to Assert.</u>  Upon execution of the assignment document, VERVE grants to OMRON the right to have VERVE assert the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS on OMRON's behalf in any litigation brought against OMRON.  The decision to assert the PATENTS and PREVIOUSLY ASSIGNED PATENTS on OMRON's behalf shall be made by OMRON in its sole and absolute discretion.  OMRON shall be responsible for all costs and expenses incurred in having the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS asserted on its behalf.

3.3.1  OMRON shall be entitled to sixty percent (60%) of all revenues and/or other monetary benefits which OMRON may obtain from having the ASSIGNED PATENTS and the PREVIOUSLY ASSIGNED PATENTS asserted on its behalf. OMRON shall be entitled to one-hundred percent (100%) of all non-monetary benefits (e.g. non-monetary cross-licenses, non-monetary distributor agreements or other non-monetary business deals).

3.4 <u>Right to Notice.</u>  VERVE agrees to notify OMRON of any potential licensee which VERVE intends to contact, notice or file suit against based on the ASSIGNED PATENTS, LICENSED PATENTS or PREVIOUSLY ASSIGNED PATENTS <u>prior</u> to VERVE contacting, notifying, or filing suit against any potential licensee.  OMRON and VERVE agree and understand that prior to the effective date of this Agreement, VERVE  has already provided OMRON the opportunity to determine whether certain potential licensees or parties were a present customer or client of OMRON and that VERVE has already contacted, notified or filed suit against such certain potential licensees or parties.  VERVE further agrees to allow OMRON the opportunity to first determine within thirty (30) days after VERVE notifies OMRON whether a potential licensee is a present customer or client of OMRON prior to VERVE contacting, notifying, or filing suit against that potential licensee.

4.  PAYMENT

4.1 VERVE shall pay OMRON in accordance with the following schedule:

(a) VERVE shall pay OMRON Fifty percent (50%) of the first 10,000,000.00 US dollars of total aggregate NET LICENSING REVENUE (i.e., fee = 50% of total aggregate NET LICENSING REVENUE $\leq$ $10M USD); and

(b) VERVE shall pay OMRON Forty percent (40%) of any total aggregate NET LICENSING REVENUE in excess of 10,000,000 US dollars (i.e., fee = 40% of the total aggregate  NET LICENSING REVENUE that is >$10M USD).

_T.N._   /  _k.n.b._
Omron         Verve

**OMRON 00165**

Agreement No. 031804

4.2  Best Efforts.  VERVE agrees to use its best efforts to maximize the NET LICENSING REVENUE generated from the PATENTS.

4.3  Accounting and Reports.  VERVE agrees to make a full written report to OMRON detailing the fees due pursuant to Section 4.1 above within thirty-days (30) of any payments being received by VERVE.  Such written reports shall include a full and complete account of all payments reducing the amount of the NET LICENSING REVENUE.  Such an accounting shall include a detailed breakdown of all APPLIED DEDUCTIONS.

4.4  Expenses.  APPLIED DEDUCTIONS shall not be applied more than once.  Any APPLIED DEDUCTIONS which are found to have been applied more than once shall be reimbursed to Omron within ten (10) days of OMRON's notification to VERVE of the same.  Such reimbursement shall include a payment equal to one and a half times the amount of the improperly applied APPLIED DEDUCTIONS.

4.5  Records.  VERVE agrees to maintain records showing the aggregate COLLECTED LICENSING REVENUE and APPLIED DEDUCTIONS to enable the fees payable hereunder by VERVE to be determined.  VERVE further agrees to permit its books and records to be examined from time to time to the extent necessary to verify the written reports provided.

4.6  Timing of Payments:  VERVE shall pay all fees owed within thirty (30) days of VERVE's receipt of payment.  Each payment shall be submitted with the written report provided for in Section 4.3.  Payments provided for in this Agreement, when overdue, shall bear interest at a rate per annum equal to three percent (3%) in excess of the "PRIME RATE" published by "The Wall Street Journal" at the time such payment is due, and for the time period until payment is received by OMRON.

4.7  Payment Instructions:  VERVE shall remit payment on OMRON's behalf to:

> The Bank of Tokyo-Mitsubishi Ltd.
> Branch:  Head Office
> Account Name:  Omron Corporation
> Account Number:  9036434
> SWIFT Code: BOTKJPJT

4.8  Withholding:  Pursuant to United States IRS guidelines, VERVE shall withhold ten percent (10%) of its payments made to OMRON's and deposit this money on OMRON's behalf with the IRS.  VERVE shall provide proof of such a payments to OMRON along with VERVE's written report provided for in Section 4.3 above.

5.  WARRANTIES, LIMITATION OF LIABILITY, AND TERMINATION

5.1 WARRANTIES.

Page 6 of 9

T.N.    /    R.m.G,
Omron        Verve

OMRON 00166

Agreement No. 031804

5.1.1 OMRON represents and warrants that: (a) it is a company duly organized, validly existing, and in good standing under the laws of Japan and has full power and authority to enter into this Agreement and perform its obligations hereunder; and (b) it has the legal right to grant all the rights it purports to grant and to convey all the rights it purports to convey pursuant to Section 2.1 above.

5.1.2 VERVE represents and warrants that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas and has full power and authority to enter into this Agreement and perform its obligations hereunder.

5.1.3 EXCEPT AS PROVIDED IN THIS SECTION 5.1, EACH PARTY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY (IF ANY) IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, AND OF LACK OF NEGLIGENCE OR LACK OF WORKMANLIKE CONDUCT OR EFFORT. ALL PATENTS ASSIGNED UNDER THIS AGREEMENT ARE PROVIDED AS IS WITH ALL FAULTS, AND NO WARRANTIES OR PROMISES ARE MADE THAT THE SAME ARE VALID, INFRINGED BY THIRD PARTIES, ENFORCEABLE, OR WILL WORK FOR ANY PARTICULAR PURPOSE. EXCEPT AS PROVIDED IN THIS SECTION 5.1, THERE IS NO WARRANTY OF TITLE, AUTHORITY OR NON-INFRINGEMENT IN ANY SUCH PATENTS.

5.2 LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE IMMEDIATELY PRECEDING SENTENCE SHALL HAVE NO APPLICABILITY TO ANY LEGAL CAUSE OF ACTION ARISING FROM ANY PARTY'S ACTIVITIES OUTSIDE THE SCOPE OF THIS AGREEMENT. EXCEPT FOR VERVE'S LIABILITY ARISING UNDER SECTIONS 3 AND 4 ABOVE, NEITHER PARTY'S TOTAL LIABILITY ARSING UNDER THIS AGREEMENT SHALL EXCEED ONE THOUSAND DOLLARS ($1,000.00).

5.3 TERMINATION FOR CAUSE. INTENTIONAL OR ROUTINE MISREPORTING OR MISAPPLICATION OF APPLIED DEDUCTIONS OR COLLECTED LICENSING REVENUE SHALL BE GROUNDS FOR IMMEDIATE TERMINATION OF THIS AGREEMENT. WHEN SO TERMINATED, ALL RIGHTS GRANTED TO VERVE TO THE ASSIGNED PATENTS, LICENSED PATENTS AND PREVIOUSLY ASSIGNED PATENTS SHALL REVERT BACK TO OMRON.

6.    GENERAL

6.1 ENTIRE AGREEMENT. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and to the extent that this Agreement is

Page 7 of 9


Omron      Verve

inconsistent with any prior agreement(s) between the Parties, the terms of this Agreement are to control.

6.2  AMENDMENT.  This Agreement shall not be amended or otherwise modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of OMRON and VERVE by their respective duly authorized representatives.

6.3  GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (excluding conflicts of law rules) and of the United States.

6.4  ASSIGNMENT.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.5  NO WAIVER.  No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

6.6  SAVINGS CLAUSE.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect and the offending provision, if possible, shall be modified by the Court to be acceptable and as close in meaning as possible to give effect to the original intent of the Parties.

6.7  SECTION HEADINGS.  The section headings used in this Agreement are intended for convenience only and shall not be deemed to supersede or modify any provisions.

T-N.  ,  R.m.b
Omron      Verve

**OMRON 00168**

6.8  CONFIDENTIALITY.  The parties hereto shall keep the terms of this Agreement confidential and shall not now or hereafter divulge, without the prior consent of the other, any portion of this Agreement to any third-party except: (1) to a governmental body having jurisdiction to request and to read the same; or (2) to legal counsel representing either party. Notwithstanding the above, no disclosure of this Agreement shall be made without the disclosing party first giving the other party reasonable prior notice so as to allow the other party sufficient time to seek a protective order or otherwise assure the confidentiality of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**OMRON CORPORATION**                    **VERVE, L.L.C.**

Tetsuyuki Nakano, Senior Manager          _____
Name, Title                               Principal

March 19, 2004                            March 17, 2004
Date                                      Date

T.N.        R.m.b.
Omron      Verve

**OMRON 00169**

# Appendix A

"ASSIGNED PATENTS" shall mean the eleven (11) United States patents listed in Appendix A to this Agreement.

OMRON 00170

Agreement No. 030804

## Appendix A

## Patents For Assignment

|  | Patent # | Title | Expiration Date | Remaining Term |
|---|---|---|---|---|
| 1. | 4,587,379 | Card authenticating apparatus for card-based transaction processing system | 23-Mar-04 | 6 Months |
| 2. | 4,688,174 | Electronic cash register | 6-Apr-04 | 7 Months |
| 3. | 4,757,448 | Electronic cash register | 27-Oct-06 | 3+ Years |
| 4. | 4,797,540 | Payment making terminal device | 5-Nov-07 | 4+ Years |
| 5. | 4,847,762 | ECR having means for establishing a data format and processing entered data in accordance with an established data format | 30-Mar-07 | 3+ Years |
| 6. | 4,859,838 | POS terminal device | 16-Nov-07 | 4+ Years |
| 7. | 4,935,608 | Card authorization terminal system in which one terminal transmits data to a designated other terminal | 30-Mar-08 | 4+ Years |
| 8. | 5,012,077 | Credit and debit card processing terminal | 29-Sep-08 | 5+ Years |
| 9. | 5,053,957 | Electronic cash register having discount prices selected by customer level | 20-Oct-08 | 5+ Years |
| 10. | 5,128,983 | Transaction processing terminal capable of loading data externally transmitted and transaction processing system including the same | 18-Jun-10 | 6+ Years |
| 11. | 5,245,164 | Transaction processing apparatus | 27-Jan-12 | 8+ Years |

OMRON 00171

# Appendix B

"LICENSED PATENTS" shall mean the nine (9) United States patents listed in Appendix B to this Agreement.

Agreement No. 030804

## **Appendix B**

## **Patents to Be Exclusively Licensed to Verve**

|    | Patent #   | Title                                                                                                          | Expiration Date | Remaining Term       |
|----|------------|--------------------------------------------------------------------------------------------------------------|-----------------|----------------------|
| 1. | RE32,985   | Credit transaction processing system                                                                         | 15-Sep-06       | 3+ Years             |
| 2. | 4,707,785  | Electronic cash register with means to enter discount prices directly by keyboard                            | 29-Jul-05       | 1 Year, 9 Months     |
| 3. | 4,797,540  | Payment making terminal device                                                                               | 5-Nov-07        | 4+ Years             |
| 4. | 4,800,493  | Electronic cash register                                                                                     | 8-Aug-05        | 1 Year, 11 Months    |
| 5. | 4,875,163  | Electronic cash register system with faster access time to price look-up file                                | 14-Sep-07       | 4+ Years             |
| 6. | 4,935,608  | Card authorization terminal system in which one terminal transmits data to a designated other terminal       | 30-Mar-08       | 4+ Years             |
| 7. | 4,949,258  | Transaction processor which derives a commodity code from an article code and stores sales of data of both   | 12-May-08       | 4+ Years             |
| 8. | 5,023,781  | Electric cash register                                                                                       | 20-Feb-07       | 4+ Years             |
| 9. | 5,128,983  | Transaction processing terminal capable of loading data externally transmitted and transaction processing system including the same | 18-Jun-10       | 7+ Years             |

Page 10 of 12

**OMRON 00173**

# Appendix C

"PREVIOUSLY ASSIGNED PATENTS" shall mean the four (4) United States patents listed in Appendix C to this Agreement.

OMRON 00174

Agreement No. 030804

**Appendix C**

**Patents Previously Assigned**
**under Assignment**
**Agreements Nos. 081303 and 101403**

|   | **Patent #** | **Title** | **Issue Date** |
|---|---|---|---|
| 1. | 4,562,340 | Terminal device for making payments for credit transactions. | 1985-12-31 |
| 2. | 4,562,341 | Electronic cash register. | 1985-12-31 |
| 3. | 4,630,200 | Electronic cash register capable of performing cash-dispensing transactions. | 1986-12-16 |
| 4. | 4,678,895 | System for making payments for transactions. | 1987-07-07 |

**OMRON 00175**

# <u>Appendix D</u>

Assignment Agreement No. 081303.

OMRON 00176

Agreement Ref. No. 081303

# PATENT ASSIGNMENT AGREEMENT
## BETWEEN
## OMRON CORPORATION
## AND VERVE, L.L.C.

This AGREEMENT ("Agreement") is entered into as of August 15, 2003 by and between OMRON Corporation, a company organized under the laws of the country of Japan ("OMRON"), and VERVE, L.L.C., a limited liability company organized under the laws of the State of Texas ("Verve"). OMRON and Verve are hereinafter referred to as the "Parties."

WHEREAS, OMRON owns United States Patent Number 4,630,200 (copy included as Attachment 1) and United States Patent Number 4,678,895 (copy included as Attachment 2) ("Patents"); and

WHEREAS, OMRON desires to assign, and Verve desires to acquire, all right, title, and interest in and to Patents.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration receipt of which each party hereby acknowledges, the parties hereby agree as follows:

1. DEFINITIONS

1.1 "PATENTS" shall mean United States Patent Number 4,630,200 and United States Patent Number 4,678,895.

1.2 "OMRON" means OMRON Company and its SUBSIDIARIES together with its corporate parent and the parent's SUBSIDIARIES.

1.3 "SUBSIDIARIES" of a company means corporations or other legal entities (I) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (II) which do not have outstanding shares or securities but the majority of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly.

1.4 "COLLECTED LICENSING REVENUE" shall mean the gross total revenue received by or through Verve from the sale, license, transfer, or disposition of any of the Patents minus APPLIED DEDUCTIONS. COLLECTED LICENSING REVENUE shall be calculated in U.S. dollars, using established generally accepted accounting principles.

1.5 "VERVE" means Verve, LLC, a Texas Limited Liability Company.

1.6 "APPLIED DEDUCTIONS" shall mean the reasonable third-party attorneys fees, out-of-pocket costs, and third-party expert witness fees, Verve incurs to obtain or

OMRON 00177

Agreement Ref. No. 081303

collect revenue through the sale, license, transfer, or disposition of any of the Patents. APPLIED DEDUCTIONS shall not include any fees for the time spent by Verve personnel. Third-party attorneys fees shall not exceed the following fee schedule:

    (a) reasonable hourly fees for any pre-suit investigation, settlement communications and related agreement work, and preparing, filing and serving of any suit and any other legal work related to such suit(s) up to the start of discovery; or

    (b) 21% of any Collected Licensing Revenue if discovery commences in any suit up to and including preparation for trial or trial becomes necessary in any suit.

## 2. GRANT OF RIGHTS.

2.1  Subject to the conditions set forth in Section 2.3 of this Agreement, OMRON agrees to assign all of OMRON's right, title and interest in the Patents, including any and all accrued causes of action for damages for infringement thereof. In furtherance of this Agreement, OMRON hereby acknowledges that, from the Effective Date forward, Verve has succeeded to all of OMRON's right, title, and standing to receive all rights and benefits pertaining to the Patents, to institute and prosecute all suits and proceedings, and to take all actions that Verve, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind under the Patents, whether arising before or after the Effective Date.

In order to affect such ownership transfer, contemporaneously with the execution of this Agreement, OMRON has executed certain separate assignment documents, to be recorded with the United States Patent and Trademark Office. OMRON shall cooperate with Verve as reasonably necessary to effectuate the recording of the separate assignment documents with the United States Patent and Trademark Office.

2.2  OMRON shall deliver to Verve non-confidential documentation pertaining to the Patents, including copies of non-confidential correspondence to or from potential licensees of the technology claimed in the Patents.

2.3  Upon execution of the assignment document, Verve grants back to OMRON and OMRON's customers/clients to be agreed upon by Verve and OMRON a non-exclusive, worldwide, irrevocable, perpetual, royalty-free, fully paid-up, license under the Patents to reproduce, make, have made, use, import, offer for sale, and sell any products or services.

## 3. PAYMENT

3.1  Verve shall pay OMRON in accordance with the following schedule:

OMRON 00178

(a) Verve shall pay OMRON Forty-four percent (44%) of the first 5,000,000 US dollars of Collected Licensing Revenue dollars (i.e., fee = 44% of Collected Licensing Revenue ≤ $5,000,000); and

(b) Verve shall pay OMRON Thirty percent (30%) of any Collected Licensing Revenue dollars in excess of 5,000,000 US dollars (i.e., fee = 30% of the Collected Licensing Revenue that is >$5M).

3.2    Verve agrees to use its best efforts to maximize the Collected Licensing Revenue generated from the Patents. Verve agrees to make quarterly written reports to OMRON detailing the fees due pursuant to Section 3.1 above. Verve's obligation to produce this report commences in the first quarter in which Collected Licensing Revenue is collected. Verve further agrees to maintain records showing the aggregate Collected Licensing Revenues and Applied Deductions to enable the fees payable hereunder by Verve to be determined.  Verve further agrees to permit its books and records to be examined from time to time to the extent necessary to verify the written reports provided.

3.3    Verve shall pay all fees owed on a quarterly basis to OMRON. The quarterly fee payments shall be submitted with the written report provided for in this Section 3.2.  If no amount is accrued during any quarterly period, a written statement to that effect shall be furnished to OMRON.  Payments provided for in this Agreement, when overdue, shall bear interest at a rate per annum equal to three percent (3%) in excess of the "PRIME RATE" published by "The Wall Street Journal" at the time such payment is due, and for the time period until payment is received by OMRON.

4. WARRANTIES AND LIMITATION OF LIABILITY

4.1 WARRANTIES.

4.1.1 OMRON represents and warrants that: (a) it is a company duly organized, validly existing, and in good standing under the laws of the State of          and has full power and authority to enter into this Agreement and perform its obligations hereunder; and (b) it has the legal right to grant all the rights it purports to grant and to convey all the rights it purports to convey pursuant to Section 2.1 above.

4.1.2 Verve represents and warrants that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas and has full power and authority to enter into this Agreement and perform its obligations hereunder.

4.1.3    EXCEPT AS PROVIDED IN THIS SECTION 4.1, EACH PARTY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY (IF ANY) IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, AND OF LACK OF NEGLIGENCE OR LACK OF WORKMANLIKE CONDUCT OR EFFORT. ALL PATENTS ASSIGNED UNDER THIS AGREEMENT ARE PROVIDED AS IS WITH ALL FAULTS, AND NO WARRANTIES OR PROMISES ARE MADE THAT

Agreement Ref. No. 081303

THE SAME ARE VALID, INFRINGED BY THIRD PARTIES, ENFORCEABLE, OR WILL WORK FOR ANY PARTICULAR PURPOSE. EXCEPT AS PROVIDED IN THIS SECTION 4.1, THERE IS NO WARRANTY OF TITLE, AUTHORITY OR NON-INFRINGEMENT IN ANY SUCH PATENTS.

4.2    IMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE IMMEDIATELY PRECEDING SENTENCE SHALL HAVE NO APPLICABILITY TO ANY LEGAL CAUSE OF ACTION ARISING FROM ANY PARTY'S ACTIVITIES OUTSIDE THE SCOPE OF THIS AGREEMENT. EXCEPT FOR VERVE'S LIABILITY ARISING UNDER SECTION 3 ABOVE, NEITHER PARTY'S TOTAL LIABILITY ARSING UNDER THIS AGREEMENT SHALL EXCEED ONE THOUSAND DOLLARS ($1,000.00).

5. GENERAL

5.1 ENTIRE AGREEMENT. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and to the extent that this agreement is inconsistent with any prior agreement(s) between the Parties, the terms of this agreement are to control.

5.2    AMENDMENT.    This Agreement shall not be amended or otherwise modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of OMRON and Verve by their respective duly authorized representatives.

5.3 GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (excluding conflicts of law rules) and of the United States.

5.4    ASSIGNMENT.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.5 NO WAIVER. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

5.6 SAVINGS CLAUSE. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect and the offending provision, if possible, shall be modified by the Court to be acceptable and as close in meaning as possible to give effect to the original intent of the Parties.

OMRON 00180

Agreement Ref. No. 081303

5.7   SECTION HEADINGS. The section headings used in this Agreement are intended for convenience only and shall not be deemed to supersede or modify any provisions.

5.8   CONFIDENTIALITY.   The parties hereto shall keep the terms of this Agreement confidential and shall not now or hereafter divulge, without the prior consent of the other, any portion of this Agreement to any third party except: (1) to a governmental body having jurisdiction to request and to read the same; or (2) to legal counsel representing either party.   Notwithstanding the above, no disclosure of this Agreement shall be made without the disclosing party first giving the other party reasonable prior notice so as to allow the other party sufficient time to seek a protective order or otherwise assure the confidentiality of this Agreement.

OMRON 00181

Agreement Ref. No. 081303

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**OMRON CORPORATION**

_Tetsuyuki Nakano, Senior Manager_
Name, Title

_August 13, 2003_
Date

**VERVE, L.L.C.**

Principal

_August 20, 2003_
Date

# <u>Appendix E</u>

Assignment Agreement No. 101403

OMRON 00183

Agreement No. 101403

# PATENT ASSIGNMENT AGREEMENT
# BETWEEN
# OMRON CORPORATION
# AND VERVE, L.L.C.

This AGREEMENT ("Agreement") is entered into as of October 14, 2003 by and between OMRON Corporation, a company organized under the laws of Japan ("OMRON"), and VERVE, L.L.C., a limited liability company organized under the laws of the State of Texas ("Verve"). OMRON and Verve are hereinafter referred to as the "Parties."

WHEREAS, OMRON owns United States Patent Number 4,562,340 (copy included as Attachment 1) and United States Patent Number 4,562,341 (copy included as Attachment 2) ("Patents"); and

WHEREAS, OMRON desires to assign, and Verve desires to acquire, all right, title, and interest in and to Patents.

NOW, THEREFORE, for and in consideration of the mutual covenants contained herein, and for other good and valuable consideration receipt of which each party hereby acknowledges, the parties hereby agree as follows:

1.   DEFINITIONS

   1.1  "PATENTS" shall mean United States Patent Number 4,562,340 and United States Patent Number 4,562,341.

   1.2 "OMRON" means OMRON Company and its SUBSIDIARIES together with its corporate parent and the parent's SUBSIDIARIES.

   1.3 "SUBSIDIARIES" of a company means corporations or other legal entities (I) the majority of whose shares or other securities entitled to vote for election of directors (or other managing authority) is now or hereafter controlled by such company either directly or indirectly; or (II) which do not have outstanding shares or securities but the majority of whose ownership interest representing the right to manage such corporation or other legal entity is now or hereafter owned and controlled by such company either directly or indirectly.

   1.4 "COLLECTED LICENSING REVENUE" shall mean the gross total revenue received by or through Verve from the sale, license, transfer, or disposition of any of the Patents minus APPLIED DEDUCTIONS.  COLLECTED LICENSING REVENUE shall be calculated in U.S. dollars, using established generally accepted accounting principles.

   1.5 "VERVE" means Verve, LLC, a Texas Limited Liability Company.

   1.6 "APPLIED DEDUCTIONS" shall mean the reasonable third-party attorneys fees, out-of-pocket costs, and third-party expert witness fees, Verve incurs to obtain or collect revenue through the sale, license, transfer, or disposition of any of the Patents.  APPLIED DEDUCTIONS shall not include any fees for the time spent by Verve personnel.  Third-party attorneys fees shall not exceed the following fee schedule:

Agreement No. 101403

(a)    reasonable hourly fees for any pre-suit investigation, settlement communications and related agreement work, and preparing, filing and serving of any suit and any other legal work related to such suit(s) up to the start of discovery; or

(b)    21% of any Collected Licensing Revenue if discovery commences in any suit up to and including preparation for trial or trial becomes necessary in any suit.

## 2.    GRANT OF RIGHTS.

2.1    Subject to the conditions set forth in Section 2.3 of this Agreement, OMRON agrees to assign all of OMRON's right, title and interest in the Patents, including any and all accrued causes of action for damages for infringement thereof.  In furtherance of this Agreement, OMRON hereby acknowledges that, from the Effective Date forward, Verve has succeeded to all of OMRON's right, title, and standing to receive all rights and benefits pertaining to the Patents, to institute and prosecute all suits and proceedings, and to take all actions that Verve, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind under the Patents, whether arising before or after the Effective Date.

In order to affect such ownership transfer, contemporaneously with the execution of this Agreement, OMRON has executed certain separate assignment documents, to be recorded with the United States Patent and Trademark Office.  OMRON shall cooperate with Verve as reasonably necessary to effectuate the recording of the separate assignment documents with the United States Patent and Trademark Office.

2.2    OMRON shall deliver to Verve non-confidential documentation pertaining to the Patents, including copies of non-confidential correspondence to or from potential licensees of the technology claimed in the Patents.

2.3    Upon execution of the assignment document, Verve grants back to OMRON and OMRON's customers/clients to be agreed upon by Verve and OMRON a non-exclusive, worldwide, irrevocable, perpetual, royalty-free, fully paid-up, license under the Patents to reproduce, make, have made, use, import, offer for sale, and sell any products or services.

## 3.    PAYMENT

3.1    Verve shall pay OMRON in accordance with the following schedule:

(a) Verve shall pay OMRON Forty-four percent (44%) of the first 5,000,000 US dollars of Collected Licensing Revenue dollars (i.e., fee = 44% of Collected Licensing Revenue $\leq$ $5,000,000); and

(b) Verve shall pay OMRON Thirty percent (30%) of any Collected Licensing Revenue dollars in excess of 5,000,000 US dollars (i.e., fee = 30% of the Collected Licensing Revenue that is >$5M).

3.2    Verve agrees to use its best efforts to maximize the Collected Licensing Revenue generated from the Patents.  Verve agrees to make quarterly written reports to OMRON detailing the

FROM                                    (TUE)OCT 14 2003 22:22/ST.22:21/NO.6338574192 P   4

Agreement No. 101403

fees due pursuant to Section 3.1 above. Verve's obligation to produce this report commences in the first quarter in which Collected Licensing Revenue is collected. Verve further agrees to maintain records showing the aggregate Collected Licensing Revenues and Applied Deductions to enable the fees payable hereunder by Verve to be determined.  Verve further agrees to permit its books and records to be examined from time to time to the extent necessary to verify the written reports provided.

3.3    Verve shall pay all fees owed on a quarterly basis to OMRON. The quarterly fee payments shall be submitted with the written report provided for in this Section 3.2.  If no amount is accrued during any quarterly period, a written statement to that effect shall be furnished to OMRON. Payments provided for in this Agreement, when overdue, shall bear interest at a rate per annum equal to three percent (3%) in excess of the "PRIME RATE" published by "The Wall Street Journal" at the time such payment is due, and for the time period until payment is received by OMRON.

4.    WARRANTIES AND LIMITATION OF LIABILITY

4.1    WARRANTIES.

4.1.1    OMRON represents and warrants that: (a) it is a company duly organized, validly existing, and in good standing under the laws of the State of     and has full power and authority to enter into this Agreement and perform its obligations hereunder; and (b) it has the legal right to grant all the rights it purports to grant and to convey all the rights it purports to convey pursuant to Section 2.1 above.

4.1.2    Verve represents and warrants that: (a) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Texas and has full power and authority to enter into this Agreement and perform its obligations hereunder.

4.1.3    EXCEPT AS PROVIDED IN THIS SECTION 4.1, EACH PARTY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING BUT NOT LIMITED TO ANY (IF ANY) IMPLIED WARRANTIES OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, AND OF LACK OF NEGLIGENCE OR LACK OF WORKMANLIKE CONDUCT OR EFFORT. ALL PATENTS ASSIGNED UNDER THIS AGREEMENT ARE PROVIDED AS IS WITH ALL FAULTS, AND NO WARRANTIES OR PROMISES ARE MADE THAT THE SAME ARE VALID, INFRINGED BY THIRD PARTIES, ENFORCEABLE, OR WILL WORK FOR ANY PARTICULAR PURPOSE. EXCEPT AS PROVIDED IN THIS SECTION 4.1, THERE IS NO WARRANTY OF TITLE, AUTHORITY OR NON-INFRINGEMENT IN ANY SUCH PATENTS.

OMRON 00186

Agreement No. 101403

4.2    LIMITATION OF LIABILITY. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHATSOEVER ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE IMMEDIATELY PRECEDING SENTENCE SHALL HAVE NO APPLICABILITY TO ANY LEGAL CAUSE OF ACTION ARISING FROM ANY PARTY'S ACTIVITIES OUTSIDE THE SCOPE OF THIS AGREEMENT.  EXCEPT FOR VERVE'S LIABILITY ARISING UNDER SECTION 3 ABOVE, NEITHER PARTY'S TOTAL LIABILITY ARSING UNDER THIS AGREEMENT SHALL EXCEED ONE THOUSAND DOLLARS ($1,000.00).

5.    GENERAL

5.1    ENTIRE AGREEMENT. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and to the extent that this agreement is inconsistent with any prior agreement(s) between the Parties, the terms of this agreement are to control.

5.2    AMENDMENT. This Agreement shall not be amended or otherwise modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of OMRON and Verve by their respective duly authorized representatives.

5.3    GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (excluding conflicts of law rules) and of the United States.

5.4    ASSIGNMENT. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.5    NO WAIVER. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving party.

5.6    SAVINGS CLAUSE. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect and the offending provision, if possible, shall be modified by the Court to be acceptable and as close in meaning as possible to give effect to the original intent of the Parties.

5.7    SECTION HEADINGS. The section headings used in this Agreement are intended for convenience only and shall not be deemed to supersede or modify any provisions.

OMRON 00187

Agreement No. 101403

5.8    CONFIDENTIALITY.   The parties hereto shall keep the terms of this Agreement confidential and shall not now or hereafter divulge, without the prior consent of the other, any portion of this Agreement to any third party except: (1) to a governmental body having jurisdiction to request and to read the same; or (2) to legal counsel representing either party.   Notwithstanding the above, no disclosure of this Agreement shall be made without the disclosing party first giving the other party reasonable prior notice so as to allow the other party sufficient time to seek a protective order or otherwise assure the confidentiality of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

OMRON CORPORATION                          Verve, L.L.C.

_Tetsuyuki Nakano /Senior Manager_          _R. m. Guhn_
Name/Title                                  Principal

_October 14, 2003_                          _October 14, 2003_
Date                                        Date

OMRON 00188

# <u>Appendix F</u>

The flow chart entitled "Collected Revenue Flow Chart for Revenue Paid To Omron By Verve Under Agreement No. 030804" (attached as Appendix F to this Agreement)



Appendix F:  Collected Revenue Flow Chart for Revenue Paid To Omron By Verve Under Agreement No. 031804.

Appendix to Agreement No. 031804

**OMRON 00190**

# EXHIBIT C

ADDENDUM 1-033004

ADDENDUM 1-033004 TO PATENT ASSIGNMENT AND
LICENSE AGREEMENT NO. 031804
BETWEEN OMRON CORPORATION AND VERVE, L.L.C.

This ADDENDUM to Patent Assignment and License Agreement No. 031804 (this "ADDENDUM") is made and entered into effective the 1st day of April, 2004, by and between OMRON Corporation, a corporation organized under the laws of Japan ("OMRON"), and VERVE, L.L.C., a limited liability company organized under the laws of the State of Texas ("VERVE"). OMRON and VERVE are hereinafter referred to as the "Parties."

WITNESSETH:

WHEREAS, OMRON and VERVE wish to amend Patent Assignment and License Agreement No. 031804 (the "AGREEMENT"), so to grant OMRON the right to sub-license the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS to OMRON's present and future business partners and customers without limitation or waiver.

NOW, THEREFORE, OMRON and VERVE, intending to be legally bound, hereby agree as follows:

## OMRON'S RIGHT TO SUBLICENSE AND CROSS-LICENSE

1.0 Right to Sub-License and Cross-License. Under OMRON's license defined in Section 3.1 of the AGREEMENT, OMRON is granted the right to sub-license and cross-license the ASSIGNED PATENTS, LICENSED PATENTS and PREVIOUSLY ASSIGNED PATENTS to OMRON's present and future business partners and customers as OMRON determines and sees fit.

2.0 Notwithstanding Sections 3.2 and 3.4 of the AGREEMENT, OMRON's right to sub-license and cross-license applies also to those parties who are initially approved by OMRON under Section 3.4, as well as those parties against whom VERVE has already filed suit .

3.0 Reimbursement to VERVE. Where OMRON grants a license to a party against whom VERVE has already filed suit, OMRON agrees to reimburse VERVE for all of its reasonable third-party attorney fees, out-of-pocket costs and expert witness fees which VERVE has incurred in its attempts to obtain COLLECTED LICENSING REVENUE from the licensed party. For all such reimbursements, VERVE must provide OMRON with a detailed report within thirty (30) days of any deductions or reimbursements being made.

4.0 Limitation on Reimbursements. OMRON's reimbursement to VERVE under Section 3.0 shall only be paid from: 1) the payments OMRON receives under the AGREEMENT during OMRON's active fiscal year (i.e. the current fiscal year in which OMRON grants a license requiring reimbursement); and 2) the payments which OMRON receives under the

ADDENDUM 1-033004

AGREEMENT during future fiscal years (i.e. payments received in fiscal years after the fiscal year in which OMRON has granted a license requiring reimbursement).

5.0  In no case shall VERVE be entitled to reimbursement or payment beyond those detailed in Section 4.0 above.  Further, in no case shall VERVE be entitled to any reimbursements or payments from OMRON based on payments received by OMRON under the AGREEMENT during prior fiscal years (i.e. the fiscal years prior to the fiscal year in which OMRON grants a license requiring reimbursement).  Accordingly, reimbursement expenses are to be paid to VERVE using only OMRON's future payments under the AGREEMENT, and such expenses are to be carried forward from one fiscal year to another until they are satisfied in full.  OMRON's fiscal year runs April 1st to March 31st each year. Accordingly, VERVE's reimbursement from OMRON shall be limited to:

    a) Ninety-percent (90%) of the total payments received by OMRON under the AGREEMENT during the fiscal year in which the license requirement reimbursement is granted; and

    b) One-hundred percent (100%) of all future payments from VERVE to OMRON during subsequent fiscal years.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the Effective Date.

**OMRON CORPORATION**                    **VERVE, L.L.C.**

_Tetsuyuki Nakano, Senior Manager_        _R ~ Jeh_
Name, Title                               Principal

_April 2, 2004_                           _May 5, 2004_
Date                                      Date

**OMRON 00192**

# EXHIBIT D

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

VERVE, LLC,                        )
                                   )
                Plaintiff,         )      **CIV 05-0365-PHX-FJM**
                                   )
        vs.                        )      Phoenix, Arizona
                                   )      October 24, 2006
**HYPERCOM CORPORATION,**          )         9:00 a.m.
                                   )
                Defendant.         )
_____)
                                   )
**HYPERCOM CORPORATION,**          )
                                   )
            Counterclaimant,       )
                                   )
        vs.                        )
                                   )
**VERVE, LLC, et al.,**            )
                                   )
            Counterdefendants.)
_____)

### BEFORE:  THE HONORABLE FREDERICK J. MARTONE, JUDGE

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### JURY TRIAL

#### VOLUME IV

(Pages 675 through 905, inclusive.)


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

INDEX

SUMMARY OF COURT PROCEEDINGS                                        PAGE:

Proceedings Outside Presence of the Jury                            678
Proceedings Outside Presence of the Jury                            792
Proceedings Outside Presence of the Jury                            853
Proceedings Outside Presence of the Jury                            867


INDEX OF WITNESSES

| WITNESSES FOR THE COUNTERDEFENDANT IMES: | Direct | Direct (Mr. Dichter) | Cross (Ms. Limon-Wynn) | RD |
|---|---|---|---|---|
| IMES, Kevin R. | 678 | 709 | 721 | 726 |

| WITNESSES FOR THE COUNTERDEFENDANTS VERVE/SG&F/GALASSO: | Direct | Voir Dire | Cross | RD |
|---|---|---|---|---|
| GULKO, Brad | 728 | 748 | | |
| GALASSO, Raymond | 762 | | 809 | 827 |

INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 37 | Photographs of Simon Galasso & Frantz Office | 866 |
| 99 | Settlement Agreement re Verve and FDC | 726 |
| 109 | Verve Point of Sale Portfolio Assessment | 709 |
| 150 | Letter to John Rybert from Raymond Galasso | 816 |
| 153 | Fifth Third Bank - Financial Statement of Raymond Galasso | 825 |
| 155 | 2005 Tax Return of Simon Galasso & Frantz | 847 |

UNITED STATES DISTRICT COURT

1   A.   That's correct.

2   Q.   I've prepared a chart that I want to ask you about.

3        MR. RASH:   Your Honor, can I see the chart before it

4   gets published?

5        MS. LIMON-WYNN:   Sure.

6        THE COURT:   Sure.

7        MR. RASH:   Your Honor, I'm going to object, because

8   it goes beyond the scope of direct, this line of questioning.

9   Unfortunately the Court can't see the --

10       THE COURT:   No, I can't.

11       MS. LIMON-WYNN:   Your Honor, what it goes into is

12  exactly what was asked on direct examination, and that was

13  about licenses.   They termed them as licenses that they've

14  received from various entities.   So this describes the

15  monetary amounts that they received.

16       THE COURT:   The objection is overruled.

17  Q.   (BY MS. LIMON-WYNN)   Can you see that chart, Mr. Imes?

18  A.   Yes, I can.

19  Q.   Okay.   Is it not true that Verve and Omron received in

20  settlement from Schlumberger $230,000?   Yes or no.

21  A.   That is correct.

22  Q.   And did Verve and Omron also receive $5,000 from a company

23  called MIST that is also known as NBS Technologies?

24  A.   You might have misread your entry.   You said $5,000.   It's

25  $45,000.

UNITED STATES DISTRICT COURT

```
 1    Q.   $45,000?

 2    A.   Yes.

 3    Q.   Thank you.  Verve and Omron received $45,000, correct?

 4    A.   That's my understanding.  I don't have the agreements in

 5    front of me, so it's difficult for me to say.  But if you say

 6    it is, then I'll agree with you.

 7    Q.   And as to Radiant, Radiant paid $100,000 to settle; is

 8    that true?

 9    A.   That's my understanding.

10    Q.   And CyberNet paid $25,000 to settle; is that true?

11    A.   That's my understanding.

12    Q.   And Lipman paid $97,250, correct?

13    A.   Sure, yeah.

14    Q.   Are you saying you don't know?

15    A.   Here again, without the agreements in front of me, I don't

16    have that personal knowledge right now, but --

17    Q.   You know that Lipman settled and that Lipman paid money,

18    correct?

19    A.   Yes, I do.

20    Q.   And First Data paid Verve $157,000; is that not correct?

21    A.   There again, same answer.

22    Q.   As a Verve owner, you are entitled to 50 percent of what

23    Verve receives; isn't that correct?

24    A.   Of net proceeds.

25    Q.   50 percent of what Verve receives, correct?
```

UNITED STATES DISTRICT COURT